JONES, Ohief Judge,
dissenting in part:
The contract involved here was experimental in nature. Both Beam and defendant understood this. The requirements of Contract 955 included a certain type of rubber cable. It was necessary that the cable meet rigid tests. Neither party knew whether such a cable could be produced. Beam was willing to undertake it. The Government gave Beam four different chances to produce such a cable. Each cable failed to meet the test. Shortly thereafter the contracting officer terminated the contract for default.
On June 4, 1952, Beam appealed the contracting officer’s termination of Contract 955. The Armed Services Board of Contract Appeals held a hearing in May 1953, and on October 1, decided that the evidence did not justify burdening appellant with the liabilities of a default. At most, said the Board, the evidence would justify only a termination for convenience.
Under the circumstances of this case, we are of the opinion that the proper remedy was that of termination for the convenience of the Government, if termination was desired. * * * Appellant’s failure to live up to contract time of performance was quite obviously the result of the awaiting of tests, in which delay the Government was active in participating and which it accepted as an incident of performance. It was an excusable delay, and should not subject appellant to the liability of a default * * *. [Finding 28.]
*25 The liabilities the Board sought to obviate were the damages the Government might sustain in entering repurchase contracts. In fact, the Government entered into two repurchase contracts for the procurement of the electric lighting sets originally covered by Contract 955 at no additional cost.
Shortly after the Board decision, Beam’s counsel requested of the contracting officer various forms prescribed for filing termination claims under contract section 21, “Termination for Convenience of the Government.” The contracting officer responded with the forms and stated in reference to the Board decision as follows:
In view of said decision the Government deems the above notice of default to have been issued pursuant to Clause 21 of the contract entitled, “Termination for the Convenience of the Government,” * * *.
Thereafter, counsel for Beam stated his belief that “the contractor is not limited to the rights specified in said clause entitled ‘Termination for Convenience of the Government’, and that the notice of termination constituted a breach of the contract for which the contractor is entitled to recover damages, which would apparently be in excess of the amounts payable under the ‘Termination for Convenience of the Government’ clause.” [Emphasis supplied.]
Subsequently, this suit was filed, with the plaintiff claiming all of Beam’s costs plus the expected profit on the entire contract. The plaintiff bases this claim on the position that the Government should not be allowed to change the designation of a termination from one for default to one for the convenience of the Government.
In these circumstances, with a contract as uncertain of performance as the one involved in this suit, to permit a recovery of $180,000 in wholly speculative profits cannot be justified. I am convinced, however, that the plaintiff should be allowed to recover the costs and pro rata profits which would have been allowed had the Government originally assigned the proper designation to the termination of the contract.
This case ought not be considered as an ordinary breach of contract situation with but an added twist — the Government trying to avoid paying damages by converting a frank *26 breach of contract into a termination for convenience. An original assumption that there has been a breach of contract by the Government only serves to becloud critical consideration of the issues and is improper. In this case, if the Government had any right to terminate, any right by whatever designation to issue a termination order, there has been no breach at all. Possibly there has been a procedural error, but such error should not have the effect of a breach of contract.
I conceive this case as being roughly analogous to one where a party in suit proves less, or more, than it alleged and tries to amend its pleadings to conform to the proof. Here, the Government failed before the Contract Appeals Board to prove an inexcusable default by the contractor, but it appears the Government did establish grounds for terminating the contract for convenience. Thereupon, the Government amended the termination notice from “default” to “convenience of the Government.”
For example, if a vendee, obligated under a valid sales contract, refuses tender of the goods stating incorrectly that the proper delivery date has passed, apparently the vendee has breached his contract. But if, thereafter, he proves that the goods irreparably failed to meet the contract specifications, there is little doubt that he has a valid defense against suit. It is the refusal of the tender, an act which the vendor claims was wrongful, for which he brings suit. If the vendee had any valid reason for his refusal of the tender, even if he stated the wrong reason in the beginning, he will avoid a judgment of damages, providing only that the vendor has not been misled to his detriment by the original reason assigned to the refusal of tender. According to Professor Williston, “To hold, as a broad proposition, that stating one reason for refusing to accept tendered performance precludes a promisor from later stating another reason * * * seems almost grotesque.” This case should be judged by similar principles.
Certainly, it would be outrageous if the Government could escape paying damages for failing to perform its own contractual obligations by retroactively antedating any such misconduct with a termination order — “for the convenience *27 of tbe Government.” For example, if the Government failed to deliver material which it had contracted to furnish on March 1, it could not properly issue on April 1, a termination order antedated February 1. That kind of governmental convenience would be beyond the contemplation of the parties to the contract.
In this case, however, the plaintiff claims that the breach of contract was the issuance of the termination order, not some other act, before which the Government is trying to insert a termination order. Plaintiff is correct if the termination could only be substantiated on a finding of unjustifiable default. But if the Government, in the first instance, had a right to terminate the contract under any designation, then I fail to see that there has been a breach at all. The Government then did what it had a right to do, terminate, although it gave the wrong reason. Furthermore, if the plaintiff was injured by the delay in properly designating the termination, it may recover in the final settlement provided in the “Termination for Convenience of the Government” section of the contract. It is not entitled, however, to all its expected profits on the entire contract.
There are few precedents in the field to guide the court. One Supreme Court case is in point. In College Point Boat Corp. v. United States, 267 U.S. 12 (1925), affirming this court, Justice Brandéis stated that the Government had an unconditional right to cancel the contract in suit even though the Government itself had clearly breached the contract, and notwithstanding the plaintiff was already in this court suing the Government for its breach. The court’s opinion in the case before us points out that the cancellation in College Point was permitted by a special statute then in force, whereas in this case, all the parties’ rights must be derived from the contract provisions themselves. While I agree here with the majority opinion, I do not believe that the Government’s rights under this contract are much inferior to those it had under the College Point statute. The contract here gave the Government a broad right to terminate, not wholly unconditional, a right which might be exercised only for the best interests of the United States. But absent proof of fraud or caprice, I believe the contracting officer’s judgment *28 of the best interests of the United States vis a vis the contract ought to be conclusive.
A diligent search has failed to uncover any significant statute, regulation, or even case discussion of what criteria a contracting officer must consider in determining when termination of a contract is in the best interests of the Government. It is reasonable to assume that such criteria might include the technical progress made by the contractor in the research and development phases of the work, current and future availability of financing, current labor-management relations, continued need for the equipment — either greater or less than when the contract was let, availability of alternative producers, and estimated production and delivery dates when it appears that the contract dates cannot be met.
We know the contractor was experiencing serious difficulty in obtaining the required rubber cable. The trial commissioner who heard the evidence and saw the witnesses face to face, saw fit to quote in finding 28 portions of the opinion of the Armed Services Board of Contract Appeals. The trial commissioner followed the quotation with this sentence:
Some of the findings or determinations of the ASBCA were not supported by substantial evidence.
The trial commissioner also added this footnote:
(1) On February 26,1952, Beam submitted its fourth cable sample to EKDL to be tested. This cable was tested by EKDL after termination of Contract 955. It passed some of the requirements of the specifications but did not meet the physical requirements. Testimony before the Board on this point was incorrect, contrary to the facts. Beam contended and defendant’s counsel at the time and a witness admitted that the cable had met the requirements of Contract 955. However, laboratory reports now in evidence, and testimony during the trial by the laboratory technician who made the tests, reveal that while the cable passed the low-temperature test, it failed to meet other physical requirements and was not acceptable.
The trial commissioner found, and I agree, that even the fourth cable sample submitted by Beam failed to meet the contract specifications and was unacceptable. The majority has seen fit to eliminate the above-quoted sentence and foot *29 note and substitute a finding tbat all of the Board’s findings were supported by substantial evidence. I would restore the trial commissioner’s findings.
At best, the degree of rubber cable development is a disputed point. Besides the rubber problems, Beam was still handicapped by his inability to improve his financial position and was further hampered by a lack of production space. It was extremely doubtful that Beam could ever have performed the contract. Surely all must agree that the Government was not obliged to let the development and production drag on indefinitely. Considering all of this, the contracting officer, whatever other criteria he may have used, might with all justification have concluded that quicker results would be obtained with another contractor.
The determination of convenience of the Government is primarily one for the contracting officer and the administrative agency. In this case, I am unwilling to contradict the determination as made for I see nothing arbitrary or unjust in the result. Therefore, it is my conclusion that the Government had grounds for terminating the contract for convenience when it first issued the termination order, and should be permitted to amend the order to read “Termination for Convenience of the Government.” But in doing so it must pay any damage that may have been caused by the delay in assigning the proper reason for the termination.
There is another reason why I must dissent from the decision of the court. I believe that Beam did default its contract and that the plaintiff is trying to recover here by side-stepping the express provisions of the contract.
Section 11 of the contract entitled “Default” describes default procedures in detail, as follows: *30 Subsection (b) provides for circumstances where nonperformance is excused and protects the contractor from liability for “excess cost if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor.” Expressly included among these uncontrollable causes are “acts of the Government.”
*29 (a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
(i) if the Contractor fails to make delivery of the supplies or to perform services within the time specified herein or any extension thereof; or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, * * *.
*30 These sections are clear and uncontroverted. The dispute centers on the application of subsection 11(e), which provides:
If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall he deemed to have teen issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights and obligations of the parties hereto shall in such event be governed by such clause. * * * [Emphasis supplied.]
This paragraph, by its terms, applies only when there has been a failure to perform which is found to be excusable.
I believe it manifest from the facts of this case that Beam did fail to perform the contract. Beam agreed to deliver 500 electric lighting equipment sets commencing on or before November 20, 1951. Delivery was to be completed by February 21,1952, yet as of April 3,1952, none of the sets had been produced, and of course none delivered. The primary cause of Beam’s failure to perform was the unavailability of rubber cable sufficient in quality to meet the contract specifications. Beam knew in the beginning of the risks inherent in the contract, for a new low-temperature rubber had to be developed if the contract requirements would be met. To this end, Beam subcontracted the rubber production to one of America’s largest rubber manufacturers. Nevertheless, delivery dates came and passed with no suitable rubber produced and no lighting sets assembled. Various change orders were issued from time to time modifying the technical specifications of the sets to be manufactured, but Beam never received an extension of delivery schedule by contract modification.
*31 I accept the Board’s determination that Beam’s failure to deliver the sets resulted in part from the Government’s delay in testing the rubber samples. The Board was properly concerned lest Beam be burdened with the drastic liabilities of a default. I agree that Beam’s delay was excusable, but it was delay well beyond the contract delivery dates. That the Government was not free from error does not mean it had to wait indefinitely for the sets. True, the rubber company was ever-closer approaching success when the contract was terminated, adding a hint of melodrama to the case, but solicitude for the plight of the contractor alone should not act to deprive the Government of unambiguous contract rights.
The contractor’s nonperformance was excusable, but it is a rare situation, indeed, where excusable nonperformance can be equated with full performance. Certainly the facts permit no such equation here. The contractor did not perform but should not be subjected to the liability of a default; neither should such liability be rested on the Government.
Subsection 11(e) of the contract states that when, as here, a Notice of Default is deemed to have been issued pursuant to the clause of the contract entitled “Termination for Convenience of the Government”, the rights and obligations of the parties to the contract shall in such event be governed by that clause. Accordingly, the contractor ought to recover the sum of his costs, $69,347.33; a profit (6 percent of costs), $4,160.84; settlement expenses, $729.00; less partial payments received, $16,052.01; totaling a net amount of $58,185.16. I believe that this is the full amount allowable to plaintiff regardless of whether the matter is treated as a breach of contract or otherwise. I can find no just ground for adding any additional amount.
FINDINGS 03? FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a citizen of the United States and of the State of Illinois, is the assignee for the benefit of the creditors of Beam Radionics Corp. pursuant to a written assignment *32 executed September 13, 1955. Beam Radionics Corp. (hereinafter referred to as Beam) is an Illinois corporation which formerly had its principal place of business at 224 North Desplaines Street, Chicago, Illinois, and is now insolvent.
2. On June 27,1951, Beam and defendant, acting through the United States Army Corps of Engineers, Philadelphia District, entered into Department of Defense Negotiated Contract No. DA 36-109-ENG-955 (referred to hereinafter as contract 955). Under this contract Beam agreed to deliver to defendant 500 No. 2, 1 y2 kw electric lighting equipment sets at a price of $925 for each set, delivery to commence on or before November 20, 1951, and to be completed by February 21, 1952, plus 500 No. 4, 5 kw electric lighting equipment sets at a price of $2,425 for each set, delivery to commence on or before November 20, 1951, and to be completed by April 22,1952. The total contract price was $1,675,000. Among the terms of the contract were the following provisions:
PARTIAL PAYMENTS
Partial payments, which are hereby defined as payments prior to delivery, on work in progress for the Government under this contract, may be made upon the following terms and conditions.
(a) The Contracting Officer may, from time to time, authorize partial payments to the Contractor upon property acquired or produced by it for the performance of this contract: Provided, that such partial payments shall not exceed 75 percent of the cost to the Contractor of the property upon which payment is made, which cost shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer: Provided further, that in no event shall the total of unliquidated partial payments (see (c) below) and of unliquidated advance payments if any, made under this contract, exceed 80 percent of the total contract price of supplies still to be delivered.
(b) Upon the making of any partial payment under this contract, title to all parts, materials, inventories, work in process and nondurable tools theretofore acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereto under sound accounting practice, shall forthwith vest in the Government; and title to all like property there *33 after acquired or produced by the Contractor for tbe performance of this contract and properly chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisition or production: Provided, that nothing herein shall deprive the Contractor of any further partial or final payments due or to become due hereunder; or relieve the Contractor or the Government of any of their respective rights or obligations under this contract.
(c) In making payment for the supplies furnished hereunder, there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made to the Contractor, under the authority herein contained.
(d) It is recognized that property (including, without limitation, completed supplies, spare parts, drawings, information, partially completed supplies, work in process, materials, fabricated parts and other things called for herein) title to which is or may hereafter become vested in the Government pursuant to this clause will from time to time be used by or put in the care, custody or possession of the Contractor in connection with the performance of this contract. The Contractor, either before or after receipt of notice of termination at the option of the Government, may acquire or dispose of property to which title is vested in tlie Government under this clause, upon terms approved by the Contracting Officer: Provided, that after receipt of notice of termination, any such property that is a part of termination inventory may be acquired or disposed of only in accordance with the provisions of the clause of this contract entitled Termination for Convenience of the Government and applicable laws and regulations. The agreed price (in case of acquisition by the Contractor) or the proceeds received by the Contractor (in case of any other disposition), shall, to the extent that such price and proceeds do not exceed the unliquidated balance of partial payments hereunder, be paid or credited to the Government as the Contracting Officer shall direct; and such unliquidated balance shall be reduced accordingly. Current production scrap may be sold by the Contractor without approval of the Contracting Officer but the proceeds will be applied as provided in this paragraph (d), provided, that any such scrap which is a part of termination inventory may be sold only in accordance with the provisions of the Termination for Convenience of the Government of this contract and applicable laws and regulations. Upon *34 liquidation, of all partial payments hereunder or upon completion of deliveries called for by this contract, title to all property (or the proceeds thereof) which has not been delivered to and accepted by the Government under this contract or which has not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the Government under this clause shall vest in the Contractor. Under GENERAL Provision's were the following:
5. INSPECTION
(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
* * * * *
(o) * * * All inspections and tests by the Government shall be performed in such a manner as not to unduly delay the work. * * *
11. Deeaui/t
(a) The Government may, subject to the provisions of paragraph (l>) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
(h) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of *35 such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.
(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, Provided, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.
(d) If this contract is terminated as provided in paragraph (a) of this clause, the Government, in addition to any other rights provided in this clause, may require the Contractor to transfer title and deliver to the Government, in the manner and to the extent directed by the Contracting Officer, (i) any completed supplies, and (ii) such partially completed supplies and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights (hereinafter called “manufacturing materials”) as the Contractor has specifically produced or specifically acquired for the performance of such part of this contract as has been terminated; and the Contractor shall, upon direction of the Contracting Officer, protect and preserve property in possession of the Contractor in which the Government has an interest. The Government shall pay to the Contractor the contract price for completed supplies delivered to and accepted by the Government, and the amount agreed upon by the Contractor and the Contracting Officer for manufacturing materials delivered to and accepted by the Government and for the protection and preservation of property. Failure to agree shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Dispute.”
(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (5) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights and obligations of the parties hereto shall in such event be gov *36 erned by such clause. {Except as otherwise provided, in this contract, this paragraph (e) applies only if this contract is with a military' department.)
(/) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.
12. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
$ $ ‡ $
21. TERMINATION EOR CONVENIENCE OF THE GOVERNMENT
(a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.
(b) After receipt of a Notice of Termination, and except as otherwise directed by the Contracting Officer, the Contractor shall (1) stop work under the contract on the date and to the extent specified in the Notice of Termination; (2) place no further orders or subcontracts for materials, services or facilities except as may be necessary for completion of such portion of the work *37 under tlie contract as is not terminated; (3) terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the Notice of Termination; (4) assign to the Government, in the manner, at the times, and to the extent directed by the Contracting Officer, all of the right, title and interest of the Contractor under the orders and subcontracts so terminated; (5) settle all claims arising out of such termination of orders and subcontracts, subject to the approval or ratification of the Contracting Officer, which approval or ratification shall be final for all the purposes of this clause; (6) transfer title and deliver to the Government, in the manner, at the times, and to the extent, if any, directed by the Contracting Officer, (i) the fabricated or unfabricated parts, work in process, completed work, supplies, and other material produced as a part of, or acquired in connection with the performance of the work terminated by the Notice of Termination, and (ii) the completed or partially completed plans drawings, information, and other property which, if the contract had been completed, would have been required to be furnished to the Government; (7) use its best efforts to sell, in the manner, at the times, to the extent, and at the price or prices directed or authorized by the Contracting Officer, any property of the types referred to in provision (6) of this paragraph, provided, howevee, that the Contractor (i) shall not be required to extend credit to any purchaser, and (ii) may keep any such property at a price or prices approved by the Contracting Officer; and provided further that the proceeds of any such transfer or disposition shall be applied in reduction of any payments to be made by the Government to the Contractor under this contract or shall otherwise be credited to the price or cost of the work covered by this contract or paid in such other manner as the Contracting Officer may direct; (8) complete performance or such part of the work as shall not have been terminated by the Notice of Termination; and (9) take such action as may be necessary, or as the Contracting Officer may direct, for the protection and preservation of the property related to this contract which is in the possession of the Contractor and in which the Government has or may acquire an interest.
(c) After receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer its termination claim, in the form prescribed by the Contracting Officer. Such claim shall be submitted *38 promptly but in no event later than one year from the effective date of termination, unless one or more extensions in writing are granted by the Contracting Officer upon request of the Contractor made in writing within such one year period or authorized extension thereof. Upon failure of the Contractor to submit its termination claim within the time allowed the Contracting Officer shall determine, on the basis of information available to him, the amount, if any, due to the Contractor by reason of the termination.
(d) Subject to the provisions of paragraph (c), the Contractor and the Contracting Officer may agree upon the whole or any part of the amount or amounts to be paid to the Contractor by reason of the total or partial termination of work pursuant to this clause, which amount or amounts may include a reasonable allowance for profit, but only on work done in connection with the terminated portion of the contract. The contract shall be amended accordingly, and the Contractor shall be paid the agreed amount. Such amendment shall be final and conclusive upon the Contractor and the Government. Nothing in paragraph (e) of this clause, prescribing the amount to be paid to the Contractor in the event of a failure of the Contractor and the Contracting Officer to agree upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this clause, shall be deemed to limit, restrict, or otherwise determine or affect the amount or amounts which may be agreed upon to be paid to the Contractor pursuant to this paragraph (d).
(e) In the event of the failure of the Contractor and the Contracting Officer to agree as provided in paragraph (d) upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this clause, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (d), shall pay to the Contractor the amounts determined as follows:
(1) For completed supplies accepted by the Government and not theretofore paid for, a sum equivalent to the aggregate price for such supplies computed in accordance with the price or prices specified in the contract, appropriately adjusted for any saving of freight or other charges;
(2) The total of—
(i) the costs incurred in the performance of the work terminated, exclusive of any costs attributable *39 to supplies paid or to be paid for under paragraph (e) (1) hereof.
(ii) The cost (which may include a reasonable allowance for profit to subcontractors or vendors, but only on work done in connection with the terminated portion of any subcontract or order) of settling and paying claims arising out of the termination of work under subcontracts or orders, as provided in paragraph (b) (5) above, which are properly chargeable to the terminated portion of the contract (exclusive of amounts paid or payable on account of supplies or materials delivered or services furnished by subcontractors or vendors prior to the effective date of the Notice of Termination, which amounts should be included in the costs payable under (i) above), provided that—
(A) Each such claim has been settled with the written approval of the Contracting Officer; or
(B) If a final judgment has been rendered against the Contractor, or a subcontractor or vendor, by a court of competent jurisdiction determining the liability of the Contractor, subcontractor, or vendor with respect to any such claim, the Contracting Officer has determined that such judgment or a part thereof is allocable to the terminated portion of the contract.
(In order for a judgment to be allowable under this Sub-paragraph (id), the Contractor, or subcontractor or vendor concerned, must have given the Contracting Officer prompt notice of the initiation of the proceedings in which such judgment was rendered and offered in writing to give the Government complete control of the defense of the proceedings, and must have diligently defended the suit or, if the Government has assumed control of the defense of the proceedings, must have rendered such reasonable assistance as has been requested by the Government. If such judgment includes amounts for loss of anticipatory profits or consequential damages, such amounts will not be allowable under this subparagraph.)
(iii) a sum equal to 2% of that part of the amount determined under (i) which represents the cost of articles and materials not processed by the Contractor, plus a sum equal to 8% of the remainder of such amount, but the aggregate of such sums shall not exceed 6% of the whole of the amount determined under (i) above.
*40 (3) The reasonable costs of settlement, including accounting, legal, clerical, and other expenses reasonably necessary for the preparation of settlement claims and supporting data with respect to the terminated portion of the contract and for the termination and settlement of subcontracts thereunder, together with reasonable storage, transportation, and other costs incurred in connection with the protection or disposition of termination inventory.
The total sum to be paid to the Contractor under (1) and (2) of this paragraph (e) shall not exceed the total contract price as reduced by the amount of payments otherwise made and as further reduced by the contract price of work not terminated. Except for normal spoilage, and except to the extent that the Government shall have otherwise expressly assumed the risk of loss, there shall be excluded from the amounts payable to the Contractor as provided in paragraph (e) (1) and paragraph (e)(2) (i), any amounts allocable to or payable in connection with property which is destroyed, lost, stolen, or damaged so as to become undeliverable to the Government, or to a buyer pursuant to paragraph (b) (7).
(f) The Contractor shall have the right of appeal, under the clause of this contract entitled “Disputes”, from any determination of the amount due to the Contractor, made by the Contracting Officer under paragraphs (c) or (e) above, except that if the Contractor has failed to submit its claim within the time provided in paragraph (c) above and has failed to request extension of such time, he shall have no such right of appeal. In any case where the Contracting Officer has made a determination of the amount due under paragraph (c) or (e) above, the Government shall pay to the Contractor the following: (i) if there is no right of appeal hereunder or if no timely appeal has been taken, the amount so determined by the Contracting Officer, or (ii) if an appeal has been taken, the amount finally determined on such appeal; any such determination being final and conclusive upon the Contractor and the Government.
(g) In arriving at the amount due the contractor under this clause there shall be deducted (1) all un-liquidated advance or other unliquidated payments on account theretofore made to the Contractor, (2) any claim which the Government may have against the Contractor in connection with this contract, and (3) the agreed price for, or the proceeds of sale of, any materials, supplies or other things kept by the Contractor or sold, *41 pursuant to the provisions of this clause, and not otherwise recovered by or credited to the Government.
(h) If the termination hereunder be partial, prior to the settlement of the terminated portion of this contract, the Contractor may file with the Contracting Officer a request in writing for an equitable adjustment of the price or prices specified in the contract relating to the continued portion of the contract (the portion not terminated by the Notice of Termination), and such equitable adjustment as may be agreed upon shall be made in such price or prices.
(i) The Government may from time to time, under such terms and conditions as it may prescribe, make partial payments and payments on account against costs incurred by the Contractor in connection with the terminated portion of this contract whenever in the opinion of the Contracting Officer the aggregate of such payments shall be within the amount to which the Contractor will be entitled hereunder. If the total of such payments is in excess of the amount finally agreed or determined to be due under this clause, such excess shall be payable by the Contractor to the Government upon demand, together with interest computed at the rate of 6% per annum, for the period from the date such excess payment is received by the Contractor to the date on which such excess is repaid to the Government.
(j) Any determination of costs under paragraph (c) or (e) hereof shall be governed by the Cost Principles set forth in Section XV of the Armed Services Procurement Kegulation, as in effect on the date of this contract.
(k) Unless otherwise provided for in this contract, or by applicable statute, the Contractor, from the effective date of termination and for a period of three years after final settlement under this contract, shall preserve and make available to the Government at all reasonable times at the office of the Contractor but without expense to the Government, all its books, records, documents, and other evidence bearing on the costs and expenses of the Contractor under this contract and relating to the work terminated hereunder, or, to the extent approved by the Contracting Officer, photographs, microphotographs, or other authentic reproductions thereof.
3. The cable used in the electric lighting equipment sets to be supplied under contract 955 was required to meet rigid military specifications as to use at extreme low temperatures, *42 as well as other physical requirements such as tensile strength and elongation after oxygen-bomb aging. Tests for compliance with these specifications were to be conducted by the Engineering Research and Development Laboratory (hereinafter referred to as ERDL) at Fort Bel voir, Virginia, on samples submitted prior to acceptance of the cable by the Corps of Engineers.
Cable of this type was in the developmental stage at the time this contract was executed, June 27,1951, and no manufacturer had produced cable meeting these requirements as of that time.
4. During the time contract 955 was in force, Beam also had Contract No-. DA 11-184-ENG-7939 (hereinafter referred to as contract 7939). That contract was executed on April 10,1951, and provided for the supplying by Beam of 250 sets of floodlighting equipment, Set No. 2, at a total price of $335,000. Beam had subcontracted with the Brad Harrison Co. of Chicago, Illinois, for cable assemblies under this contract, and Brad Harrison had subcontracted with the United States Rubber Company for production of the cable itself. The cable for contract 7939 was similar in nature to the cable required under contract 955 here in suit, although the standards required under the earlier contract were somewhat less exacting, or strict, than were the standards set up in contract 955.
When contract 955 was executed, B'eam again arranged to acquire the cable assemblies from the Brad Harrison Co., and Brad Harrison Co. again turned to the United States Rubber Company for the necessary cable. Cables under both contracts could be, and were, tested simultaneously at ERDL.
5. As Beam proceeded under contract 955 it arranged to subcontract for all of the necessary parts but retained overall supervision and coordination of the contract, plus assembly, testing, packaging, and final shipment of the finished sets.
6. By letter dated September 11, 1951, the contracting officer in Philadelphia advised the Army Audit Agency in Chicago (hereinafter referred to as AAA) that the partial-payment provision had been included in contract *43 955, and requested that the AAA contact Beam officials and make necessary arrangements to review its invoices so as to effect partial payments under this contract.
7. On September 12,1951, Beam submitted its invoice No. 10094 to the Government seeking 75-percent partial payment in accordance with the contract provision relating to such partial payments. Beam supported its claim for partial payment with the following described vendors’ invoices in the amounts shown:
1. Shepard Engineering Co. invoice No. B 3689, dated September 10, 1951, in the amount of $6,700. (However, the invoice submitted to the Government was materially different from the invoice Beam received from Shepard. (See finding 43.))
2. The Branchell Co. invoice No. AX4848, dated September 10, 1951, in the amount of $2,600.
3. Electric Supply Corp. invoice No. 32330, dated August 21, 1951, in the amount of $7,212.80, less a discount of $120.96.
The grand total covered by the invoice for materials from these vendors was $16,391.84, making the partial payment request total $12,293.88.
8. Beam invoice No. 10094 was submitted to the AAA for audit. The AAA had two methods of conducting an audit of a contractor’s request for partial payment:
(1) An audit of invoices and other supporting records could be conducted at the contractor’s place of business to determine compliance with the terms of the partial payment provision of the contract prior to making the partial payment.
(2) An office review of the partial payment request could be made of the arithmetical accuracy of the claim submitted by the contractor, following which review payment could be made. The field audit of the various vendors’ invoices and supporting records would be conducted subsequent to payment, at the contractor’s place of business.
Because of the urgency for payment, Beam officials, for the most part, personally brought its partial payment requests to the AAA in Chicago and, in order to expedite payment to Beam, an office review was made, rather than a field audit.
*44 On October 19, 1951, payment of $12,293.88 was made to Beam on its invoice No. 10094.
9. On November 20, 1951, Beam submitted its second request for partial payment under contract 955. This request, under Beam invoice M100103, was supported by the following-described vendors’ invoices:
1. Lewis Paper Products invoice No. 12821 dated November 9, 1951, in the amount of $2,536.20, less a discount of $25.36 for a net amount of $2,510.84.
2. Lorenz Engineering invoice No. 1569 dated November 15,1951, in the amount of $2,500.
The total amount of these invoices was $5,010.84, making the partial payment request $3,758.13 (75 percent of $5,010.84). An office review of this request was made by the AAA and payment in the amount of $3,758.13 was made to Beam on December 19,1951.
10. In December 1951 and January 1952 the AAA performed a field audit with regard to Beam’s partial payment invoices on the contract in suit and also with regard to partial payments made on contract 7939 and contract DA 11-022-OBD-268. This last-named contract is immaterial to this action. The audit report in this matter was prepared on February 1,1952, and dealt with certain questions in connection with Beam’s requests for partial payments on the above contracts. These questions will be covered in subsequent findings with respect to defendant’s allegation of fraud.
At the time of the audit, the AAA learned that Beam was in poor financial condition and that financial statements supplied by Beam to the AAA revealed a deficit of $33,542.91 as of June 30, 1951. Another investigation as to Beam’s financial condition had been made prior to the award of contract 955 on June 27, 1951 (see finding 19).
There is no evidence that the June 30, 1951 deficit was materially different from Beam’s financial condition as disclosed by the government’s pre-contract investigation. Moreover, the June 30, 1951 deficit was not materially different from Beam’s financial condition as of March 31, 1952.
*45 11. No partial payments were requested by Beam after November 20,1951.
12. In. early February 1952, prior to February 9, 1952, wben cable samples were submitted for testing to the ERDL, and prior to receipt of the AAA report by the Corps of Engineers at Philadelphia, Beam’s president, Edward K. Snow, and general sales manager, Bernie Schulman, had a conference in Philadelphia with officials of the Corps of Engineers, primarily with regard to contract 7939. At this meeting Messrs. Snow and Schulman also discussed certain aspects of contract 955 with Mr. Edward E. Krauss, Chief of the Supply Division, Corps of Engineers, who was responsible for the awarding and administration of the two contracts held by Beam, and Theodore F. Kliesrath, Chief of the Price Analysis Section, Supply Division, Corps of Engineers.
Mr. Krauss expressed disappointment to the officials of Beam at their failure to deliver on either contract in accordance with the schedules, and advised that the Corps of Engineers was considering cancelling either all of contract 955 or that portion concerned with the cable, since he (Mr. Krauss) was then aware that a cable meeting the Government’s specifications could be obtained from one or two other sources.
In response to Mr. Krauss’ statement that he was considering cancelling the portion of the contract concerned with the cable, Mr. Schulman of Beam said he would be happy to have the cable portion of the contract cancelled. Mr. Krauss did not tell the Beam officials of any source for the cable other than United States Rubber Company. No further action was taken to cancel the contract until March 15,1952.
13. On February 9, 1952, shortly after the above conference, Beam submitted its third sample of cable to ERDL for testing. Prior cable samples, submitted in August and October 1951, failed to meet the required specification. The February 9, 1952, cable sample was received at ERDL on February 13. No report of the test results was issued by ERDL until March 19, 1952, although the tests themselves took only two weeks to perform. Mr. Krauss was able to learn the actual test results by telephone some time in late *46 February, nearly a month before the formal test report was issued. The cable sample submitted on February 9, 1952, met the required specifications for contract 7939, but failed to meet the requirements for contract 955.
14. After Mr. Krauss had received the AAA report he sent Mr. Kliesrath to the Beam plant in Chicago to determine Beam’s responsibility and ability to proceed with contract 7939, the floodlighting contract. Mr. Kliesrath arrived in Chicago on February 20,1952 and remained for ten days, confining his investigation to contract 7939. He did not discuss the financing of contract 955 with Beam officials.
Mr. Kliesrath found that Beam was insolvent, as shown in the audit report, had no working capital or financial resources, and could not show where any financial assistance would be forthcoming.
15. Kliesrath found that Beam could not pay its subcontractors under contract 7939, and those subcontractors he visited had extended credit to Beam as far as they could, and would not complete their subcontracts without payment.
16. Upon investigation prior to awarding the contract in suit, it was noted that Beam had 56,000 square feet of available space and 192 employees. At the time of Kliesrath’s investigation Beam had only 14,000 square feet of space available for performance on all four of Beam’s Government contracts plus other civilian work. There is no evidence as to the number of employees that Beam had at the time of Kliesrath’s investigation. Kliesrath estimated that Beam could assemble from 25 to 30 floodlighting sets under contract 7939 and a limited quantity of electric sets under contract 955. Beam planned to assemble and could have assembled 100 electric sets a day.
17. Since the Government had paid Beam about 30 percent of contract 7939 in partial payments, but had not received any deliveries, Kliesrath felt that it would be in the best interests of the Government to continue this contract. He then proposed and arranged a trust agreement at one of the subcontractor’s banks, which was agreeable to all subcontractors and the Beam officials. The agreement with the bank provided that it would receive all funds from the Government, pay the subcontractors, and the balance, if any, *47 would be paid to Beam, in accordance with the trust agreement.
18. Mr. Kliesrath recommended that contract 955 be terminated for default on the ground that Beam had no working capital, and because it was not shown that financial assistance would be forthcoming. Since this contract was about four times as large as contract 7989, Kliesrath felt Beam could not finance it. He estimated that a contract of that size would require about 10 percent of its value as working capital plus additional bank financing unless the subcontractors were willing to make deliveries without payment. Kliesrath did not tell Beam officials of his intent to recommend termination of contract 955 at the time of his trip to their plant in February 1952, nor did he discuss with them at that time any possible arrangements for financing that contract.
Kliesrath’s recommendation was not based on any lack of space available to Beam.
It does not appear that Kliesrath’s recommendation formed the basis for the termination proceedings on contract 955 (see finding 21).
19. An investigation of Beam’s ability to perform had been made before the contract was awarded on June 27, 1951. However, the results of this investigation, insofar as Beam’s financial ability was concerned, are not in evidence. Beam’s financial statements for the fiscal year ended June 30, 1951, showed a deficit of $33,542.91 which became known to the AAA in December 1951. For the fiscal year ended June 30, 1952, Beam had a deficit of $112,518.04. At the time of termination of contract 955, on April 1, 1952, Beam’s current liabilities were in excess of its current assets by approximately $86,000.
20. On February 26,1952, Beam submitted a fourth cable sample to EBDL to be tested for compliance with the requirements of contract 955. Again, as in the case of the February 9 cable sample (see finding 13), there was a delay on the part of the Army in completing the tests and reporting their results. Mr. Krauss made no effort to learn the test results by telephone prior to the issuance of EBDL’s formal report, as he had done in the case of the February 9 sample. The *48 report on the February 26 sample was not issued until after the April 1,1952, contract termination notice. The sample was finally approved.
The Armed Services Board of Contract Appeals decided that this sample met the contract specifications. The defendant sought in this proceeding to show that, although the sample did fulfil the low-temperature requirements of the specifications, it did not fulfil other physical requirements. The determination of the Armed Services Board of Contract Appeals was supported by substantial evidence.
21. On March 15,1952, Mr. Krauss began termination proceedings on contract 955. By letter dated April 1,1952, the successor contracting officer advised Beam of the termination of contract 955 pursuant to contract general provision 11, “Default.” This letter stated that the reason for termination was the “failure to make delivery” of the electric lighting sets as provided under the terms of the contract. The letter further stated:
This notice constitutes a findings [sic] of fact pursuant to Paragraph 12, Disputes, of the General Provisions of said contract, which affords you the right of appeal therein specified.
22. By letter dated April 10,1952, Beam appealed the above determination of the successor contracting officer, contending that it was prepared to proceed with the manufacture of items under contract 955 as soon as the cable submitted for testing was approved.
23. On May 15 and 16, 1952, the defendant, through the Philadelphia District, Corps of Engineers, entered into two repurchase contracts at no additional cost, Nos. DA 36-109-ENG-2633 and DA 36-109-ENG-2632, respectively, with the General Electric Supply Corporation of Philadelphia, Pa., for the procurement of the electric lighting sets originally covered by contract 955 with Beam. Under the repurchase contracts, General Electric Supply Corp. subcontracted the cable assembly to the Cornish Wire Company, which in turn sub-subcontracted the rubber compounds and insulated cable (or “wire”) to United States Rubber Company, as Brad Harrison Co. had done under contract 955 itself.
*49 • Mr. Krauss, who also administered these contracts and had taken the position that Beam should have found other sources for the cable, was aware of these arrangements made by the repurchase contractor and made no objection to them.
Final delivery under the two repurchase contracts was late. A substantial part of the delay was again due to difficulties experienced at United States Bubber Co. with the co-polymer rubber compounds and the cable itself.
The Army made no effort to terminate these contracts and they were ultimately performed.
If Beam had been permitted to complete contract 955, Brad Harrison could have supplied it with cable assemblies within 120 days after approval of the cable by EBDL. Beam would have assembled the sets at the rate of 100 per day. Since the cable was approved by EBDL by mid-May 1952, at the latest [there is some conflict as to the actual date], allowing for unforeseen delays of an additional month, Beam would have been able to make delivery of the lighting sets 160 days after approval of the lighting sets, or by November 10,1952 at the latest. This was earlier than final delivery was actually made under the repurchase contracts.
Another concern known as Joy Company was awarded a lighting set contract similar to Beam’s Contract 955, also in June 1951. Deliveries under this contract were also late, but Joy Company was allowed to complete its contract.
24. By letter dated May 21,1952, the successor contracting officer acknowledged Beam’s letter of appeal of April 10 and enclosed a copy of “findings of fact,” also dated May 21,1952. Pertinent portions of the findings follow:
J * * *
* * * * *
c. Contractor has not received extension of delivery schedule by contract modification.
d. A review of the file supports default action because:
(1) The contractor has made no deliveries under Beq-uisition Nos. EP 5435-51 and EP 5412-51.
(2) Delay is not due to any of the excusable causes set forth in the contract. Contractor’s allegation that delay was caused by Government’s failure to approve cable to be used in production is untenable. Contractor *50 has failed to supply satisfactory cable within time when delivery schedule could possibly be met. No definite subcontracts were entered into for cable.
(3) A visit of the Government representative on 20 February 1952 to Contractor’s plant failed to reveal any machinery or equipment which could be used in direct manufacture under subject contract. Facilities appeared sufficient to assemble only 25-30 floodlighting sets per week. On this basis at least 30 to 40 weeks would be required to complete delivery, and would establish an approximate completion date of September 1952.[1]
(4) Potential financial ability of contractor to continue and complete performance under contract is inadequate.
(5) The contractor has received partial payments totalling $16,052.01. This is equal to approximately 70% of invoices rendered for articles which appear to be of a recoverable nature except as to engineering expenses.

Oonelmion

2. The Successor Contracting Officer therefore concludes that
a. The contractor has failed to make delivery as required under the contract.
b. Delay is not due to any of the excusable causes set forth in the contract.
c. It is in the best interest of the Government to terminate contractor’s right to proceed.
25. The additional grounds for termination set forth in the foregoing “findings” by the successor contracting officer had not been previously communicated to Beam officials in writing, and no mention of the suspected irregularities in partial payment requests was contained in these findings.
26. By letter dated June 4, 1952, Beam took exception to certain of the findings of fact contained in the successor contracting officer’s letter of May 21,1952, and requested a hearing on appeal.
27. Pursuant to contract general provision 12, “Disputes,” the defendant set the case for hearing before the Armed Services Board of Contract Appeals (hereinafter referred to as the Board, or ASBCA). The hearing was held on May *51 26,1953, at which, time witnesses for both Beam and the defendant testified and were subjected to cross-examination. A full transcript of the testimony of this hearing and evidence presented is in evidence before this court.
28. On October 1, 1953, the ASBCA issued its unanimous opinion that contract 955 should have been terminated under the contract provision “Termination for Convenience of the Government,” rather than for default, if the defendant desired termination.
Except for initial recitals, the opinion in its entirety follows:
_ The contract was terminated pursuant to General Provision 11 the “Default” article of the contract which provides the usual two classes of default numbered 11 (i) and 11 (ii), the former authorizing termination for failure to deliver as scheduled, and the latter for failure in other requirements, provided appellant does not correct its failure within 10 days from the contracting officer’s notice of the failure. There is some question as to what the successor contracting officer intended by his inclusion of the alleged insufficiency of machinery, equipment and financial ability to perform as some kind of a default. The record supports the conclusion that no 10-day notice of this failure was given that would have enabled appellant to at least try and remedy that situation if it was the fact and was remediable. Furthermore, the statement of this ground for termination has some of the earmarks of a termination for convenience of the Government. The evidence offered in support of it too, is rather uncertain in its probative force. For instance: The inspector who made the investigation and report upon which the ground of financial inability, and equipment inability was based, made inquiries principally on an entirely different contract covering flood lighting units. Furthermore, he would not say that appellant did not have sufficient space to accomplish the assembly of the lighting chests which was the part of the present contract that appellant was going to undertake itself and not subcontract. Furthermore, the inspector had no discussion with the head of the appellant company as to how the company intended to finance its contract which apparently was to be with bank aid. Another Government witness, when questioned by the presiding member of the Board stated that if the cable involved in this controversy had been satisfactory, “it is quite probable that no — the contract *52 would not Time been defaulted, because there would hare been a possibility of the contract being completed.” [We have underlined this quotation of the witness’ own words for emphasis.] Upon further examination by Government counsel this witness repeated that the fundamental reason for termination was the default in delivery attributable to the lack of a proper cable for the sets. In addition to this testimony, a witness when asked about the extent of investigation, prior to award, of appellant’s apparent abilities to perform, was unable to give any definite indication of facts found which were in any material way different from the conditions claimed as inadequate.
We shall not make an attempt to discuss the evidence upon this point in all its details, as it is sufficient to say that neither from the standpoint of procedure nor from the standpoint of proof upon the merits, is there any justification for holding that the matters set out in paragraphs (3) and (4) of the findings of fact 21 May 1952, were really a proper foundation for declaring a default on the part of appellant as distinguished from declaring a status which might justify a termination for convenience of the Government.
Paragraph Id (2) — that pertaining to the disagreement about the cable — is the real issue here. In discussing it, however, we shall make no effort to distinguish between what was done by subcontractors for appellant — such as experiments through the United States Rubber Company — and what appellant itself did, as the important question is the action taken by the parties to the contract in contemplation of accomplishing the manufacture of the required cable.
In preparing these lighting sets, a special cable was required which both sides semed to recognize as being in a somewhat experimental stage, requiring special manufacturing and testing to resist cold. At the time appellant had this contract, it also had one pertaining to flood lighting equipment. A special cable for this was also required. For the purpose of this decision, it is sufficient to speak of the tests for the cable for the flood lighting sets as being some of the initial steps towards testing for the present lighting set cable. This also was apparently recognized by both parties to the contract. As a result of this overlapping, results of tests for the flood lighting equipment cable were being awaited before initiating, specifically, action pursuant to the present contract — that is, until, as appellant claims the fact to be, it was notified that it would have to submit a cable *53 specially for testing on the lighting sets on or before 1 March, or suffer the consequences. Up to this time samples for flood lighting cable tests had not met with success, although they had arrived pretty close to the mark.
However, whether appellant was so notified or not— it is disputed — the fact is that on 26 February 1952 a sample was submitted specifically for testing for the requirements of the present contract. But on 1 April 1952, and before any returns upon this sample test, the contracting officer terminated the contract for default in delivery. Bather naturally appellant was taken by surprise in view of what had previously taken place rather strongly indicating that the Government was not adhering strictly to the time elements of the contract so long as the matter of tests stood unsettled. For instance starting with 4 December 1951, and including dates of 18 December 1951, 9 January 1952, 19 January 1952, 15 February 1952, and 23 February 1952, letters were issued by the Government approving changes in chest handles, gages for aluminum lamps, and some 13 or more other changes, as well as a notice of intended inspection of subcontractor’s plants. Considered in the light of the performance dates of the contract (above) of 20 November 1951 to 21 February 1952, and 20 November 1951 to 22 April 1952, it would seem reasonable to assume from this activity that having waived strict enforcement of the time elements of the contract, the contracting officer would at least have given appellant some reasonable indication of an intent in the future to terminate the contract if the cable was not supplied from some other source. It was known to all concerned that the 26th February sample had been submitted and nothing is shown in the record that could have led the contracting officer to believe that rejection of the sample was a foregone conclusion. As it turned out the cable was not rejected but was the first cable that really met specifications.
Under the circumstances of this case, we are of the opinion that the proper remedy was that of termination for the convenience of the Government, if termination was desired. We say that for this reason. The evidence of any change in appellant’s ability to perform, from the time prior to award when it was initially investigated and accepted, to the time the contract was terminated, was so uncertain that it would not justify any holding that in some manner appellant had jeopardized its own ability to perform, and then defaulted, The *54 conclusion should have been, for all practical purposes, one of what was for the best interests of the Government. Such a conclusion would not justify burdening appellant with the liabilities of a default. At most it would justify only a termination for convenience. Appellant’s failure to live up to contract time of performance was quite obviously the result of the awaiting of tests, in which delay the Government was active in participating and which it accepted as an incident of performance. It was an excusable delay, and should not subject appellant to the liability of a default — at least until appellant had received a reasonable warning that the Government was not going to await the result of tests any longer. Such a warning would have enabled appellant to comb the market for another source for the cable. Appellant was not afforded such an opportunity.
To the extent indicated, the appeal is sustained.
The findings and determination of the ASBCA were supported by substantial evidence.
29. There was no pleading of fraud before the ASBCA and no evidence presented of alleged irregularities on the part of Beam with regard to its partial payment requests.
30. By letter dated October 14,1953, counsel for Beam requested that the successor contracting officer forward to him the forms prescribed for filing termination claims, as required under general provision 21 (“Termination for Convenience of the Government”) of subject contract. This letter closed with the following paragraph:
This request is being made without prejudice to any of the rights of Beam Badionies Corporation arising out of the aforesaid contract, including claims for damages for the breach thereof, in addition to, or other than, those provided for in said paragraph 21.
On November 27, 1953, the contracting officer replied to the October 14 letter enclosing the requested forms, and referring to the decision of the ASBCA as follows:
In view of said decision the Government deems the above notice of default to have been issued pursuant to Clause 21 of the contract entitled, “Termination for the Convenience of the Government”, for the complete termination thereof, which became effective as of 3 April 1952, the date of the receipt of such notice by the contractor,
*55 31. On December 23,1953, counsel for Beam wrote the Secretary of tbe Army, quoting the above excerpt from the November 27 letter of the contracting officer and stating in part as follows:
After a careful study of the contract, it seems to us that the contractor is not limited to the rights specified in said clause entitled “Termination for Convenience of the Government”, and that the notice of termination constituted a breach of the contract for which the contractor is entitled to recover damages, which would apparently be in excess of the amounts payable under the “Termination for Convenience of the Government” clause.
The foregoing difference between our interpretation of the contract and that embodied in the quoted paragraph of Colonel Krueger’s letter of November 27th would not appear to be a “dispute concerning a question of fact” arising under the contract within the meaning of Paragraph 12. However, if the above-quoted statement in the letter of November 27,1953 was intended as a decision on a question of fact, rather than a conclusion as to the legal effect of the contract, this letter will constitute an appeal from said decision under the provisions of said Paragraph 12.
The successor contracting officer replied to the letter of December 23, 1953, on January 19, 1954, as follows:
Receipt is acknowledged of your letter dated 23 December 1953, in which you indicate that Beam Radionics Corporation may be entitled to compensation in excess of that which is provided for under Clause 21, of the contract, Termination for Convenience of the Government.
The issue which you raise is a strictly legal question, which cannot be disposed of administratively under the terms of the contract. Any termination settlement agreement entered into with said contractor, therefore, will be based on the contractor’s proposal in accordance with the provisions of Clause 21.
Accordingly, your letter is not considered an appeal from a finding of fact, and settlement will be processed as set forth above upon receipt of the termination forms heretofore sent to you by letter dated 27 November 1953.
32. On May 10, 1954, Beam submitted to the Philadelphia District, Corps of Engineers, a formal “Settlement Proposal” *56 on Form. DD 540 (the form prescribed for termination claims under contract Article 21) proposing to settle its termination claims against defendant for the net amount of $205,924.56. The $205,924.56 figure consisted of the following items: $10,999 purchased parts; $37,305.33 other costs; $35,675.90 general and administrative expense allocable to the contract; $130,496.34 profit on the completed portion of the contract, assuming that Beam had done 60% of the work necessary from its standpoint to complete the contract; and $7,500 settlement expenses; less $16,052.01 partial payments received. Receipt of this settlement proposal by defendant was acknowledged May 21,1954.
33. On or about March 30, 1955, Beam’s accountant, Mr. Marshall R. Lavin, was orally informed by Government officials that the maximum settlement offer which defendant would make was $26,647.19, less credit for advance payments ($16,052.01), or a net offer to Beam of $10,595.18.[2] Beam’s counsel wrote the Contract Termination Branch of the Philadelphia District on April 4, 1955, referring to this offer and stating in part as follows:
I am authorized by Beam Radionics Corporation to advise you that it does not consider your counter-proposal acceptable, particularly in view of the circumstances under which the contract was terminated which, as stated in our letter of December 23, 1953, to Colonel Krueger, Jr., constituted, hi our opinion, a breach of contract entitling the contractor to damages in excess of those payable under the “Termination for Convenience of the Government” clause.
I am giving you this formal advice hi accordance with Mr. Falkenstein’s request to Mr. Lavhi. We would appreciate your informing us as to such further action as is taken by your office.
34. On April 19, 1955, the Chief, Contract Termination Branch, Philadelphia District, replied by letter, acknowledging Beam’s rejection of “the Government’s settlement offer.” The letter continued, in part, as follows:
You are advised that action will be taken in accordance with paragraph 8-506 of Armed Services Procure *57 ment Begulation — Settlements by Determination. In furtherance of such action, this office has requisitioned the complete records of the other three Government contracts on which Beam Badionics Corporation was working during performance of the subject contract. The Army Audit Agency has also been requested to make such reaudit and further investigation as may be necessary to develop all the facts of the case.
Attached to the letter was a tabular statement showing the items in Beam’s settlement proposal which defendant had already accepted, including $10,908 for purchased parts, $1,400.58 for other contract costs, and $895.25 for settlement expenses, or a total of $18,203.83 for accepted items.
35. Subsequent to April 19, 1955, there was considerable correspondence between the defendant and Beam’s officials and attorney and accountant concerning documents desired by the defendant in its reaudit of Beam’s books and records. However, with respect to the April 19, 1955 letter announcing the Government’s intention to determine unilaterally the amount to be paid to Beam in settlement of its claim, no such determination was made by defendant, although efforts to obtain various records necessary for a reaudit continued through August 1955 or later. No further settlement was proposed, and plaintiff’s petition was filed in January 1956.
36. Prior to entering into the subject contract, Beam had undertaken to perform a dozen or more other military contracts for the Government. All of these contracts were completed, although in two cases there were delays occasioned by Government change orders affecting the contract specifications. One of these contracts was the floodlight contract, in which delay also resulted from the need to get approval of a cable. Change orders under the subject contract were also required by reason of discrepancies in the specifications.
Both of Beam’s principal officials, Mr. Snow as president and Mr. Schulman as general sales manager, had substantial prior experience with military supply and procurement matters, particularly in the electrical equipment field, by virtue of work they had done for the Government during World War II in responsible positions.
*58 DEFENDANT’S AFFIRMATIVE DEFENSE OF FRAUD AND SECOND COUNTERCLAIM
37. The defendant contends that Beam’s claim should be forfeited under 28 U.S.C. § 2514 and 41 U.S.C. § 119, because of fraud in connection with Beam’s presenting of partial payment invoices Nos. 10094 and M100103 to the Government and obtaining of payments therefor under contract 955. The defendant counterclaims for penalties for violation of 41 U.S.C. § 119 in connection with these transactions.
38. On September 12, 1951, Beam submitted to the contracting officer its invoice No. 10094 requesting partial payment for materials covered by invoices from the following subcontractors under contract 955:
Name Description Net Amount
Electric Supply Corp..__ 60 W.I.F. Lamps....-. $7,091.84
Tiie Branchell Go. Single Cavity Mold with tools & fixtures.. 2,600.00
Shepard Engineering Co. Dies, Tools & Fixtures. 6,700.00
Total. 16,391.84
39. Payment in the amount of $12,293.88 (75 percent of $16,391.84) was made to Beam on October 19, 1951.
40. The Electric Supply Corp. invoice, dated August 21, 1951, certified that the materials were being held for Beam at Electric Supply’s warehouse. As of January 7, 1952, when the AAA was making its audit, $4,712.80 of this invoice remained unpaid. This bill was later paid in connection with the trust agreement set up for contract 7939, and the defendant ultimately acquired title to these lamps after termination of the contract. Defendant has presented no evidence that the material listed was not actually in this subcontractor’s warehouse as alleged in its second affirmative defense.
41. The Branchell Co. invoice, dated September 10, 1951, was for the mold, tools and fixtures for producing certain components of the lighting sets. Branchell was to operate and maintain the tools, but they were to be owned by Beam. Branchell attempted to obtain payment of its invoice on several occasions without success, although Beam had previ *59 ously received payment on the amount of the invoice from the Corps of Engineers. On May 20, 1952, after learning of the termination of contract 955, Branchell submitted its credit memo for the full amount of the invoice to Beam. The mold, tools, and fixtures covered by the invoice were used by Branchell on other contracts.
42. On September 5,1951, Shepard Engineering Company of St. Louis, Missouri, submitted a proposal to Beam to furnish dies, tools, and fixtures for the production of shields, reflectors, and locknuts. The proposal contained the following provisions:
Tooling charges amortized in the above quoted prices are: $1200 for reflectors, $5000 for shields, and $500 for locknuts. Tooling charges to be paid one-half with order and one-half upon presentation of first production units.
* * * Tools shall become your property on completion of the contract.
43. On September 7,1951, Beam submitted a purchase order to Shepard for dies, tools, and fixtures totaling $6,700. The order provided:
All tools needed to produce the following parts, become property of Beam on completion of contract.
No check for one-half the tooling charges accompanied the order. Shepard, on September 10, 1951, issued invoice B 8689 to Beam for dies, tools, and fixtures totaling $6,700. A copy of this invoice contained the following provisions:
Tools to be paid for 75% in advance 20 days from invoice. Balance in 4 equal monthly payments starting November 1,1951.
The original of that invoice, which was submitted to the AAA in connection with Beam’s partial payment request, did not contain any of the provisions as to method of payment. After the office review of this invoice, the Government accountant, without knowledge of its terms of payment, recommended payment of the invoice. Had he been aware of the terms of payment, as shown on copies of the invoice, he would not have recommended partial payment to Beam.
*60 44. Shepard already had in its plant, from a prior contract a full set of the dies, tools, and fixtures called for by the subcontract. Shepard did not intend to make a new set of tools until it received payment from Beam; for work on contract 955, it intended to use this set of tools already in existence. Thus, the “progress report” on ostensible new tooling, which Shepard sent Beam on October 31,1951, was fictitious, since Shepard had not begun to make any new tools. However, Shepard billed Beam and continued to insist on payment for “new” tools. There is no evidence that Beam sought to deceive the Government or to conceal the terms of the Shepard subcontract.
45. Shepard, like Branchell, negotiated with Beam on various occasions for payment of its invoice without success, even though Beam had received payment of the invoice from the Corps of Engineers. After the contract was terminated, Shepard made no claim for payment of this invoice, and the tools, dies, and fixtures were retained by that company.
46. By registered letter dated March 5, 1953, the Corps of Engineers made a formal demand on Beam for repayment of monies paid Beam as partial payments on the invoices of Branchell Co. and Shepard Engineering Co. This letter stated, in part, as follows:
The subcontractors who presented these invoices to you claim that they received no payment therefor, nor did they pass title to you for the materials covered by said invoices. In view of the above, said monies, together with interest at the rate of 6% thereon, must be returned to the Government within twenty (20) days of receipt hereof.
Beam replied by letter dated March 27, 1953, requesting that repayment of these sums be held in abeyance pending the outcome of Beam’s appeal for breach of contract by the Government wherein sums in excess of the refunds requested were claimed by Beam.
47. Beam submitted its second partial payment request under contract 955 on November 20, 1951. Beam’s invoice No. M100103, which covered this request, was supported by the following vendors’ invoices for materials acquired:
*61 Name Description Net Amount
Lewis Paper Products.. Colton twine-$2,510.84
Lorenz Engineering— Engineering_ 2,500.00
Total. $5,010.84
A partial payment in the amount of $3,758.13 (75 percent of $5,010.84) was made by defendant to Beam on December 19,1951.
48. At the time of submission of Beam’s invoice M100103 on November 20, 1951, it had not paid the amounts shown by these invoices to the firms involved. As of January 7, 1952, the date of the AAA audit, Beam still owed Lewis Paper Products $634.05 and Lorenz Engineering $500.
49. The evidence establishes that the Lorenz Electronic Engineering Co. is and was at the time of the submission of partial payment invoice No. M100103 a sole proprietorship of Frank J. Lorenz, independent of Beam, having its own books of account and employees. There was, however, a close relationship between Beam and Lorenz. Lorenz occupied space in Beam’s plant and performed Beam’s engineering work, since Beam had no engineer in its own employ. On occasion, Frank Lorenz wrote letters for Beam, when they concerned the work he was performing for Beam.
DEFENDANT’S THIRD COUNTERCLAIM
50. In its third counterclaim, the defendant contends that Beam violated the False Claims Act, Bevised Statutes §§ 3490 and 5438, 31 U.S.C. § 231, and counterclaims for double damages and penalties under that Act. The defendant alleged that Beam conspired with others to defraud it by obtaining payment for false and fraudulent partial payment invoices under contract 7939. This contract was executed on April 10, 1951, and ran simultaneously with contract 955 during the entire time that contract 955 was in effect. Contract 7939 contained a partial payment provision identical with the one in contract 955.
*62 A. THE TRANSACTION WITH MURAKAMI AND SONS, INC.
51. During the period of a field audit in December 1951 and January 1952, certain documents and facts pertaining to the Murakami transaction were discovered by Government auditors. Murakami and Sons, Inc. (hereinafter referred to as Murakami) was a firm located in Chicago, Illinois. Its president was Arthur Murakami.
In June 1951, Murakami agreed to provide the floodlight chests under contract 7939 at $29.50 per box. The initial purchase requisition issued by Beam was dated June 27, 1951, and accepted the proposal of $29.50 per box. Shortly thereafter, the amount of this purchase requisition was changed to $69.50 per box.
52. By invoice No. 2029, dated August 13,1951, Murakami billed Beam for $34,750, which represented 500 floodlight chest assemblies at $69.50 per chest. This invoice was submitted to the Government in connection with Beam’s invoice for partial payment No. 9962, dated August 17, 1951. The Murakami invoice was the only invoice included on this partial payment request by Beam. On September 11, 1951, Beam received payment of $26,062.50 (75 percent of $34,-750) from the Corps of Engineers as a result of this partial payment request.
53. Thereafter Beam paid Murakami $17,375 (one-half of Murakami’s bill for $34,750), which included $14,750 on Murakami’s original price of $29.50 per chest and an additional $2,625. On September 29, 1951, Murakami issued its credit memo to Beam in the amount of $20,000 representing a $40 reduction per unit in the 500 floodlight chests. Beam did not advise the Corps of Engineers of this $20,000 credit. There is no evidence of what became of the additional $2,625 which had been paid to Murakami.
54. As a result of the above transaction, Beam received $26,062.50 from the Government on its partial payment request. Murakami’s original price of $29.50 per chest totaled $14,750 for the 500 chests, which would have entitled Beam to a partial payment of $11,062.50 (75 percent of $14,750). Thus Beam received $15,000 from the Government to which it was not entitled. Since Beam completed contract 7939 *63 early in 1953, under the trust agreement mentioned previously, the Government recouped this $15,000 by the delivery of the floodlight sets.
55. The only monetary loss sustained by the Government was the loss of the use of the $15,000 for the period between September 11, 1951, when the partial payment was made, and the date when it was recouped in June 1952.
B. THE TRANSACTION WITH MODERN ALUMINUM CASTINGS CO.
56. Defendant has alleged fraud on contract 7939 in connection with Beam’s partial payment invoice No. 10014, dated August 24,1951, with regard to Modem Aluminum Castings Co. invoice No. 21430, dated August 21,1951, in the amount of $4,464.14. Defendant alleged that after the request for partial payment, the latter invoice was cancelled by Modern’s letter of September 25, 1951, and that Beam received a partial payment from the Government on this invoice but did not advise the Government of the cancellation or deduct the amount of partial payment from subsequent partial payment requests.
57. During the course of the AAA audit, the Government auditors reported that on September 25,1951, a partial payment was made to Beam on contract 7939 which included Modem Aluminum Castings Co. invoice 21430, dated August 21, 1951, in the amount of $4,464.14. The AAA reported that this invoice was cancelled by letter and that, as of January 7, 1952, when the report was prepared, no part of the $4,464.14 had been paid to the Modern Aluminum Castings Co.
Defendant failed to produce in evidence the above invoice or Beam’s partial payment request referred to in its allegation, or the letter of cancellation quoted in its allegation, and offered no testimony with regard to this matter.
O. THE TRANSACTION WITH HARRISON IRON WORKS
58. In the spring of 1951, Beam requested Harrison Iron Works [hereinafter referred to as Harrison], a corporation located in Chicago, Illinois, to submit prices on steel forgings to be used on contract 7939. Prior to submitting a proposal, Harrison notified Mr. B. C. Basche, a salesman for Beam, *64 by telephone, that, before Harrison would prepare the tooling, Beam would have to send a check in payment at the same time the purchase order was mailed. Thereafter, on May 11, 1951, Harrison submitted a proposal confirming the telephone conversation. The proposal did not include any mention of advance payment, but stated: “Price quoted is F.O.B. our plant and includes forging only. Terms and payment to be arranged with our credit department.”
59. On June 14, 1951, Beam submitted its purchase order No. 1581 to Harrison, for dies, in the total amount of $2,515. No check in payment was included by Beam.
Immediately upon receiving the purchase order without the check, Mr. Alvin Bloom of Harrison called Beam. He spoke to Easche and asked why the check was not enclosed. Easche replied that a check would be sent. At this time, Easche requested an invoice, and Harrison thereafter issued to Beam its invoice No. 8828, dated July 23, 1951, in the amount of $2,515.
60. Beam, by its invoice No. 9905, dated August 7, 1951, requested a partial payment from the Government. This request included Harrison’s invoice No. 3823.
Harrison repeatedly requested payment from Easche, without success, and on August 15, 1951, Beam telephoned, requesting that Harrison cancel the order. This was confirmed by Easche’s letter dated August 15, 1951. Harrison thereafter submitted to Beam its credit memorandum No. 3843, dated September 5,1951, in the amount of $2,515. On October 25, 1951, Mr. Snow, Beam’s president, wrote to Harrison requesting a credit memorandum. On the following day, in response to Beam’s request, Harrison sent Beam a copy of the September 5 credit memorandum.
61. Beam did not notify the Government of the cancellation and on September 11, 1951, Beam received partial payment from the Corps of Engineers on its invoice No. 9905, which included 75 percent of the Harrison invoice, amounting to $1,886.25.
The $1,886.25 involved in the transaction was recouped by the Government upon completion by Beam of deliveries under contract 7939.
62. The only monetary loss sustained by the Government was the loss of the use of the $1,886.25 for the period between *65 September 11,1951, when it was paid to Beam, and the date on which it was recouped in June 1952.
DAMAGES UNDER CONTRACT 955 ON DEFAULT
63. Should it be determined that Beam defaulted on contract 955, the following amount is due the defendant. This amount does not include any penalty for fraud or interest.
Brancliell Oo. invoice AX 4848_ $2,600. 00
Shepard Engineering invoice B 3689_ 6, 700. 00
Total_ $9,300. 00
75 percent of above total_ $6,975.00
TERMINATION COSTS UNDER CONTRACT 955
64. Should it be determined that contract 955 was terminated under the contract provision “Termination for Convenience of the Government,” as found by the ASBCA, the following costs and profit would apply:
Raw materials subcontracted_ $10,999.00
Other subcontracts:
Testing light bulbs — Lorenz_ $166.25
Engineering services — Lorenz- 20, 937. 50
Storage — Hastings Products_ 112. 50 21,216.25
Total subcontracted_ $32,215.25
Other costs:
Freight in_ 161. 58
Parts shipped to Government_ 14.40
Return arc welder_ 150. 00
Moving parts_ 75. 00
Travel_ 1,056.10 1, 457. 08
Total subcontracts and other costs- $33, 672.33
General and administrative expense allocable to contract 955_ 35,675.00
Total costs incurred_ $69,347.33
Profit (6% of costs)- 4,160.84
Total_ $73,508.17
Less partial payments received- $16,052.01
Amount due Beam on contract- $57,456.16
Add — Settlement expenses_ 729.00
Total due Beam- $58,185.16
*66 65. Lorenz Electronic Engineering Company was organized in 1950 and located in Beam’s Desplaines Street plant in Chicago. Lorenz first obtained desk space, but later occupied approximately 2,000 square feet of office space.
Beam was concerned strictly with assembly, with little or no engineering, and could not estimate business of the type being performed. Mr. Lorenz’ arrangement with Beam was to prepare bid estimates for Government work, with no fee attached until a contract was awarded, when he would receive a percentage thereof. His services consisted of assistance in preparation of the contract bid, preparation of bills of materials in accordance with the specifications, supervising material costs, preparation of a worksheet, working out plans for assembly of the lighting sets, and working out problems encountered by subcontractors. He also worked with Beam and suppliers who submitted price estimates on material requirements.
66. Lorenz was to receive 1 percent of the contract price on Beam’s contract 955, but about the time the contract was awarded, and it was found additional detail work would be required, his percentage was increased to 1% percent. In accordance with this arrangement, Beam issued its purchase order to Lorenz for $20,937.50, as consideration for the performance of engineering services.
Lorenz issued one invoice against this purchase order on or about November 15,1951, in the sum of $2,500, for which he received payment in five installments.
67. On March 16, 1955, Beam’s auditor, Marshall R. La-vin, submitted a report of engineering costs on contract 955 in the sum of $17,364.02 for the period from July 1,1951, to March 15, 1952. It consisted of $7,642.81 of labor for employees that Lorenz stated were engaged on this contract, $5,661 representing 90 percent of Lorenz’ salary, $1,046.62 of operational overhead, 10 percent general administration expense and 10 percent profit.
68. During that period Lorenz’ had four or five employees. He was also engaged in engineering connected with other Government contracts for Beam, and carried on a substantial manufacturing business. It is reasonable to conclude that Lorenz and his employees who were engaged on engineering *67 work of tibe Beam contract 955 were also substantially engaged on other work during this period. Lorenz submitted an invoice on November 15,1951, for $2,500.
BREACH OE CONTRACT CLAIM
69. Contract 955 provided a total contract price of $1,675,000. The plaintiff claims $272,629.60 for the alleged breach by defendant. This claim is represented by an estimated loss of profit of $219,334.28, plus costs incurred computed by plaintiff at $69,347.33, less the partial payments allowed at $16,052.01.
70. Two different summaries of procurement estimates for this contract, prepared by Lorenz, are dated August 30,1951. One summary reflects an estimated profit allowance of $50,250, which was 3 percent of the contract price. The other summary contains a figure of $205,250 which is labeled “Administration and Profit.” The plaintiff’s computations of estimated costs of performance furnished in support of its claim for loss of profits contain different figures.
71. The plaintiff claims estimated production costs of $1,408,315.34 before administration expenses. These costs include $1,192,263.29 for subcontractors’ materials and services, and $216,052.05 for other estimated costs. The estimated cost of subcontracts was based, except in two instances, upon Beam’s purchase orders.
The exceptions were the costs of the Brad Harrison Co. subcontracts (see finding 4). The purchase orders for supplies to be furnished by Brad Harrison Co. contained no amount, and plaintiff estimated their cost as $600,795. Prices for items to be furnished were computed from quotations from other firms. Other cost estimates of $216,052.05 consisted largely of export packaging, and included an allowance of direct labor for final assembly of $20,280.
72. The plaintiff allowed $47,350.38 for general administration expense as a part of the cost of performance, representing 3.3622 percent of its estimated production costs. In computing the percentage allowance for general administration expense, the plaintiff’s accountant added its estimated production costs of $1,408,315.34 for contract 955 to its actual production costs of approximately $587,950.74 for the *68 fiscal year ended June 30, 1952, and found that the total general administration expense represented 3.3622 percent of such amount.
73. Beam’s general administration expense for the fiscal year ending June 30, 1952, was approximately $63,914.58 and represented 10.8707 percent of its actual production costs. Applying 10.8707 percent to plaintiff’s estimated production costs of $1,408,315.34 would give $153,093.74 for general administration expense applicable to contract 955, instead of $47,350.38.
74. The bulk of the administrative work in connection with contract 955 had been done during the fiscal year ended June 30, 1952, even though the production costs were not actually paid. It is therefore reasonable to add the estimated production costs for contract 955 to Beam’s actual costs in order to calculate the percentage of costs represented by administrative costs.
75. The evidence supports an estimate of production costs under contract 955 of $1,495,000. It is therefore reasonable to conclude that Beam’s profit on contract 955 would have been $180,000.
76. The costs incurred toward performance prior to termination of contract 955 were $33,672.33 in subcontracts and other costs, plus $35,675 in general and administrative costs (see finding 64), a total of $69,347.33. Partial payments by the defendant amounted to $16,052.01. Thus Beam’s unre-covered performance costs amounted to $53,295.32 in addition to the loss of profit claimed.
77. Beam’s damages for breach of its contract were $249,347.33, less $16,052.01, or a total of $233,295.32.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover of and from the United States the sum of two hundred thirty-two thousand six hundred twenty dollars and thirty-two cents ($232,620.32) after allowing the United States the sum of $675 found to be due it on its third counterclaim against the plaintiff. It is further concluded that the defendant is not *69 entitled to recover on its first and second counterclaims and those counterclaims are dismissed.

 These findings (d(3) and d(4)) include references to another contract (contract 7939 for floodlighting sets) not directly Involved In the Instant suit.

 There is a one-cent discrepancy between the cited letter and the actual Government offer, due to an error in computing the amount of partial payments.